**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-11-RJL** |
| **ZACHARY JOHNSON** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Zachary Johnson to 50 months of incarceration, 3 years of supervised release, $2,000 in restitution, and a $100 special assessment. This recommendation is at the high end of the guidelines range of 41-51 months, reflecting Johnson's violent conduct and concerted action with his close associates on January 6.

## I.    INTRODUCTION

The defendant, Zachary Johnson, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

1

Johnson came to Washington, D.C. on January 6 prepared for conflict. As instructed by the leadership of the Proud Boys, Johnson met a group of approximately 100 other members at the base of the Washington Monument at 10 a.m. Johnson wore a ballistic plate carrier and carried a mouthguard and goggles. The men around him were dressed similarly, including some who carried pepper spray on their vests.

At approximately 10:30 a.m., leaders of the group organized the men into formation and marched the men away from the planned speeches at the Ellipse—and directly toward the Capitol. Johnson marched with the group and the members of his Proud Boys "chapter" as they arrived at and then marched around the perimeter of the Capitol grounds. At 12:50 p.m., the group arrived at the First Street gate of the Capitol grounds where a line of officers and fences guarded against entry. The group, including Johnson, charged through the barricades and was among the first to breach the restricted perimeter. Amidst the chaos and fighting on the west side of the Capitol, Johnson remained close by the other members of his Tampa-area Proud Boys chapter for over an hour before making their way closer to the building. At approximately 3:15 p.m., Johnson advanced with four members of his Tampa chapter into the area known as the Lower West Tunnel (the "Tunnel") where officers were engaged in a proverbial last stand against violent rioters who were attempting to access the building. There, Johnson coordinated with the four members of his Tampa chapter and joined other rioters in two coordinated efforts to push against officers so the crowd could gain access to the building. During the second push, Johnson passed forward a

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

sledgehammer and cannister of a lachrymatory agent to rioters closer to the police line. As Johnson intended, a fellow rioter sprayed the police with the weapon.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 146, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than $2.9 million.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police ("USCP")'s defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, in the Peace Circle, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Image 1 as "1st Police Barricade," circled in red and marked as Area A.

As described above, at approximately 12:50 p.m., Johnson and a large group of Proud Boys arrived at Area A. President Trump was still addressing the crowd at the Ellipse over a half mile away. At approximately 12:52 p.m., the first breach of the outer perimeter occurred, with several

members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.

Johnson charged onto Capitol grounds and made his way to the front of the mob. He stood amidst dozens of other Proud Boys with whom he had marched to the Capitol. *Exhibit 12* at 2:08. Johnson was now wearing his eye goggles, and his mouthguard was no longer visible on his ballistic vest.

By 12:58 p.m., the rioters had overwhelmed the second manned police barrier, Area B in Image 1. They flooded the area labeled "Lower West Plaza" Area C on Image 1, pushing against the barricade there. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site. Despite the chaos and the size of the crowd, Johnson remained in close contact with his fellow Proud Boys.





*Image 2: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 p.m., Metropolitan Police Department (MPD) officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   As explained *infra*, Johnson was among the rioters who violently participated in the attack on the officers on the West Front. With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had

started entering the building around 2:13 p.m. to build to a torrent.



*Image 3: Breakthroughs in the defensive line on both the left and right flanks caused the entire police line to collapse and individual officers were swallowed by the crowd (top), and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

As Officer Michael Fanone recounted:

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of

violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.[2]

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). Again, Johnson and four of his associates were among the rioters who violently participated in the attack on the officers in the LWT. The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel ("the Tunnel") led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. Construction on the Inaugural stage was underway, in this area. This archway has served as the backdrop for nine presidential inaugurations as the entrance for the President-Elect and other dignitaries on Inauguration Day. *See* "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

---

[2] Statement of Ofc. Michael Fanone, *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021), *available at* https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack



*Image 4: Photograph[3] of the archway on Inauguration Day.*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles, and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to

---

[3]  Available at https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration

testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight.[4]

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Capitol Police Sgt. Aquilino Gonell, who was present

---

[4] Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.

*Id.* (Statement of Sgt. Aquilino Gonell).

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. The actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

**B.      Johnson's Role in the January 6, 2021, Attack on the Capitol**

*Preparations for January 6*

On January 6, 2021, Johnson was a "fourth-degree" member of the organization known as the Proud Boys. The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the

Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

Through at least January 6, 2021, Enrique Tarrio was the national chairman of the Proud Boys organization. Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." Each chapter has a degree of autonomy insofar as the president of a local chapter governs that chapter in its geographic location.

Johnson was a member of the "Trigger City" or "Zone 3" chapter of the Proud Boys, which was established for Proud Boys members in the Tampa area of Florida. Johnson was a "fourth-degree" member, which was the group's highest rank of membership. A document recovered from Johnson's phone described the requirements of "fourth degree" membership as follows:

> This degree is loosely defined as 'engaging in a major conflict for the cause.' Being arrested is not encouraged although those who are immediately become fourth degrees because the court has registered a major conflict. Serious physical fights also count and it's up to each chapter to determine how serious the conflict must be to determine fourth.

On December 19, 2020, former President Trump announced plans for a Stop the Steal protest event in Washington, D.C., on January 6, 2021, the date coinciding with Congress's Certification of the Electoral College vote. Shortly thereafter, the chairman of the Proud Boys began making plans for the group's return to Washington, D.C. for January 6th.

On January 5, 2021, Johnson was added to a private, encrypted message group on Telegram for members of the Proud Boys who were in Washington, D.C. The group was called "Boots on Ground" and included more than numerous members. Participants in the group were instructed:

> Everyone needs to meet at the Washington Monument at 10amrow morning! Do not be late! Do not wear colors! Details w laid out at the pre meeting! Come out at as patriot!

12

### *Johnson and the Proud Boys Storm the Capitol*

On the morning of January 6, Johnson was at the Washington Monument. As instructed, Johnson did not wear "colors." Rather, Johnson wore a long-sleeved camouflage shirt with a patch that read "INFIDEL" on the left sleeve and "WHITE" on the right sleeve, a tactical vest, jeans, black gloves, an olive-green balaclava, a black baseball cap, yellow mouthguard, and goggles, (Image 5).



*Image 5: Still of Johnson (red circle) and his clothing*

At the Washington Monument, Johnson joined a group of over than 100 Proud Boys members, who met near the Washington Monument around 10 a.m. As instructed, none of the men were dressed in Proud Boys colors of black and yellow. Many of the men wore tactical vests and some (as pictured above) carried irritant spray, such as pepper spray.

At around 10:30 a.m., without waiting to hear President Trump speak, leaders of the group organized the men into formation and marched the group away from the Washington Monument and the nearby speeches at the Ellipse.



*Image 6: Still from Exhibit 2 (at 1:56) showing Johnson marching from the Washington Monument towards the Capitol*

As the group marched toward the Capitol, the leaders of the march addressed the men through a megaphone—telling them that in their view the police and government had failed them. For example, as the group walked past the west side of the Capitol at approximately 11:20 a.m.— more than an hour prior to the initial breach—one of the leader's of the march announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means." A few minutes later, as the group marched past U.S. Capitol Police officers at approximately 11:28 a.m., some of the men marching in the group taunted them, yelling "treason," and warning the officers, "don't make us go against you."

Within the larger group of Proud Boys, Johnson marched with his co-defendants Alan Fischer, Dion Rajewski, Brian Boele, and James Brett (Image 7).

Shortly after noon, Johnson marched with the men to a group of food trucks located at approximately 2nd Street and Constitution Avenue NW. There the group stopped and waited for approximately thirty minutes. At approximately 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, leaders of the march again mustered the men and marched them back towards the Capitol.



*Image 7: Johnson and co-defendants Rajewski (blue circle), Boele (purple circle), and Brett (yellow circle) marching together.*

The marching group arrived at the Peace Circle, at the edge of the restricted portion of Capitol grounds at Area A, at approximately 12:50 p.m. Prior to their arrival, the Peace Circle was uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol, which was

approximately 100 feet away, was guarded by a handful of Capitol Police officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."

Soon after the Proud Boys arrived, the first breach of the restricted perimeter occurred, as rioters overran and assaulted police and toppled bike racks and snow fencing protecting the area. Many of the Proud Boys joined the mob surging forward, with others encouraging the mob. Johnson and other members of the Proud Boys made their way to the front of the mob within minutes. Johnson can be seen below, now wearing his protective goggles, and standing next to the president of his Tampa-area chapter.



*Image 8: Johnson on the West Plaza with his Chapter*

### Defendant's Conduct on the West Plaza

Once Johnson reached an area known as the West Plaza, he embedded himself in the crowd of rioters who were actively battling with United States Capitol Police (Images 9 and 10).

16



*Image 9: Zoomed in photo of Johnson in the West Plaza riot.*



*Image 10: Johnson (red circle) captured in a portion of riot on the Capitol's West Plaza.*

While on the West Plaza, in response to a question posed by a man who was recording the scene, Johnson made clear his intent to interfere with the certification of the election, responding, "I know exactly what's going on right now. Fake election. They think they're going to fucking

cheat us out of our vote and put communist fucking Biden in office. It ain't fucking happening today, buddy." *Exhibit 3*.



*Image 11: Still from Exhibit 3 capturing Johnson in the West Plaza crowd.*

18

Johnson remained in close proximity to the other Proud Boys and his co-defendants as violence broke out in the West Plaza. In the image below, Johnson can be seen standing directly behind Fischer and Boele as rioters assaulted a line of officers.



*Image 12: Johnson, Fischer, and Boele*

Johnson remained close to his co-defendants and other Proud Boys as officers pushed the crowd back and reformed a police line. In the image below, one of the leaders of the Proud Boys march to the Capitol can be seen taking a selfie-style photograph. Boele can be seen in the foreground, and Johnson's extended arm can be seen just behind the group and is circled in red. Other members of the group that breached the First Street gate with the Proud Boys are circled in yellow.



*Image 13*

### *Johnson's Conduct in the Tunnel*

After the 2:28 p.m. breach on the West Plaza, described above, Johnson followed the
retreating officers to the LWT and, specifically, the Tunnel. At approximately 3:15 p.m., Johnson
entered the Tunnel, where officers were already at the defensive. *Exhibit 4* at 26:48.



*Image 14: Still from Exhibit 4 (CCTV) of Johnson entering the Tunnel as other rioters position themselves for the fight with USCP.*

After entering the tunnel, Johnson pulled up his balaclava and then conferenced with his
fellow Proud Boys (and co-defendants) next to him, who then stopped abruptly, turned around and
pulled on their masks and the hoods of their hooded sweatshirts, before again facing the line of
officers and the Capitol surveillance camera. *Exhibit 4* at 26:48-27:15. Their proximity to one
another can be seen in the image below, with Johnson circled in red and three of his four co-
defendants who are visible in the image circled in yellow.



*Image 15: Still from Exhibit 5 Johnson and co-defendants in the Tunnel*

From about 3:16 p.m. to 3:18 p.m., rioters, including Johnson and his co-defendants, collectively pushed against the officers – at times rocking together in a coordinated fashion to breach the line of officers and gain entry to the interior of the Capitol building. *Id.* at 27:15-30:30. During this time, other rioters took shields from the officers, which the rioters passed back out of the Tunnel. Johnson thereby added his weight to that of the other rioters pushing against police in the tight space. *Exhibit 11* at 13:48-28:00 (Johnson can be seen at 27:46.) Johnson's position within the crowd is depicted in Image 13 below:



*Image 16: Still from Exhibit 4 showing Johson pushing in the Tunnel*

Between approximately 3:18 p.m. and 3:19 p.m., the police succeeded in pushing the rioters, including Johnson, out of the Tunnel. See *Exhibit 4*. At this time Officer Fanone was dragged out of the Tunnel by other rioters and pulled into the crowd before being brutally attacked. See *Exhibit 6* at 0:30 and *Exhibit 7* at 11:50-12:15. Johnson was in the Tunnel during this time (Image 17).



*Image 17: Still from Exhibit 6 at 0:30 which depicts Johnson and his co-defendant's expulsion from the Tunnel by MPD after MPD Officer Fanon (orange) e is dragged out by other members of the riot*



*Image 18: Still from Exhibit 7 at 12:08, which captures Johnson and fellow rioters being pushed out of the tunnel by police.*

After being ejected from the Tunnel, Johnson displayed a Proud Boys hand gesture (Image 19) and said, "proud of your fucking boy." "Proud of your boy" is a phrase frequently recited by members of the Proud Boys. *See Exhibit 8* at 2:45-2:53. Johnson and his co-defendants congratulated each other and posed for photos. *Id.* at 2:00-3:04.



*Image 19: Still from Exhibit 8 at 2:49 showing Johnson making a "white power" hand gesture with co-defendants Fischer (green) and Boele (purple)*

After their momentary ejection from the Tunnel, the rioters regrouped and tried again. Johnson and the other rioters engaged in another push, rocking together in a coordinated fashion to maximize the force they could apply against the officers, all in an effort to breach the police line and gain entry to the interior of the Capitol building.

During this second push, Johnson helped pass a fire-extinguisher-sized cannister of a lachrymatory agent (an OC-type spray) to rioters closer to the entrance of the Tunnel. *Exhibit 9* at 2:59-3:15. Johnson's intent was that the rioters would use the spray to attack officers. ECF No. 146 ¶ 6. Seconds later, a rioter used the cannister as Johnson intended, to spray the officers inside

the Tunnel, soaking them in a confined space with the noxious substance. *Exhibit 10* at 3:45-4:00.

At least one officer was hit with the spray. ECF No. 146 ¶ 6.



*Image 20: Johnson passing forward the canister (yellow circle) before it was used by other rioters.*

As part of his support for the attack on police, Johnson also helped pass a sledgehammer to the rioters ahead of him. *Exhibit 9* at 5:05-5:10. Fortunately, police officers were able to obtain possession of the sledgehammer before it could be used against them.



*Image 21: Still from Exhibit 9 at 5:07 depicting Johnson (red circle) passing forward the sledgehammer (yellow circle).*

During the attack at the Tunnel, Johnson acquired a collapsible police baton and posed with it, again making the hand gesture associated with the Proud Boys.   Like many Proud Boys that day, he posed for the picture while smoking a cigarette.



*Image 22: Johnson holding the baton (yellow circle) and making a Proud Boys hand gesture. In the background, co-defendant Fischer holds up a Capitol Police shield. Also visible are Boele (purple) and Rajewski (blue) and AJ Fischer (Fischer).*

## III.    THE CHARGES AND PLEA AGREEMENT

On May 25, 2022, a federal grand jury returned a second superseding indictment charging Johnson with six counts, including Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1). On August 17, 2023, Johnson was convicted of that offense based on a guilty plea entered pursuant to a plea agreement. *See* ECF Nos. 145 and 146.  After pleading guilty, he sat for a proffer with FBI.

## IV.    STATUTORY PENALTIES

Johnson now faces sentencing on one count of 18 U.S.C. § 111(a)(1). As noted in the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with Probation's calculation of the Guidelines and submits the calculation is as follows:

Count Two: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a)[5] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |

---

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. Johnson's conduct constituted aggravated assault both because it involved a dangerous weapon with intent to cause bodily injury and because it involved an intent to commit another felony. U.S.S.G. § 2A2.2 n.1(A), (D).

|  |  |  |
|---|---|---|
| | **Total** | **24** |
| Offense Level | | 24 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-3</u> |
| **Total Adjusted Offense Level:** | | **21** |

*See* Plea Agreement (ECF 145) at ¶5(A).

The U.S. Probation Office calculated the defendant's criminal history as category II, which is not disputed. PSR ¶ 55. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 21, Johnson's Guidelines imprisonment range is 41 to 51 months of imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.[6]

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Johnson's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Johnson did not travel to D.C. solo. He was affiliated with Proud Boys and traveled with them to the Capitol on January 6, 2021. Despite claiming his intentions were to protest the election results, Johnson clearly anticipated a battle. He wore camouflage, a

---

[6]  After Johnson pled guilty, the new Section 4C1.1 of the Sentencing Guidelines took effect.   It does not apply to Johnson, who has criminal history points and also used violence.   U.S.S.G. §§ 4C1.1(a)(1), (3).

vest, and googles, which he used to sustain the barrage of pepper spray officers deployed on the West Plaza and in the Lower West Tunnel.

Johnson's coordination with his fellow Proud Boys makes the nature and circumstances of the offense all the more serious. Unlike most January 6 rioters, Johnson multiplied the threat of his conduct by advancing on the Capitol with a large group of like-minded individuals clad in tactical gear and weaponry who were intent on disrupting the certification. Unlike many January 6 rioters, Johnson coordinated with these individuals before January 6, during their collective march to the Capitol, and while on Capitol grounds.

While Johnson has not been charged as part of a conspiracy, his actions on the grounds of the Capitol were part of a concerted action on behalf of a group that placed a premium on violence. The Supreme Court has recognized that, "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961); *see also United States v. Rhodes et al.*, 22-cr-15, 5/25/23 Sent. Tr. 111-12 (quoting *Callanan*, 364 U.S. at 593). Indeed, as Judge McFadden recently found with respect to a different Proud Boys defendant on January 6, "the violence, the planning, and the extremist intentions of the group" make a defendant's association with the Proud Boys on January 6 an aggravating factor. *United States v. Speed,* 22-cr-244 (TNM), Dkt. 67 (May 8, 2023 Sent. Tr.) at 37. "Were [the Proud Boys] but-for causes of any particular breach, who knows? But they played important roles at breach, after breach, after breach. And I haven't seen any other case, in fact, similar to this case in that regard. No party has raised any January 6 case with sort of similar evidence and sort of similar

facts." *United States v. Enrique Tarrio*, 21-cr-175 (TJK) (Sept. 5, 2023),  Sent. Tr. at 104:10 – 15.

Such was the case here. Johnson's choice to invade Capitol Grounds with other Proud Boys intent on obstruction and violence made his conduct all the more dangerous and made his objective—obstructing the certification—all the more likely to succeed.  Johnson was part of a group that planned for violence, immediately focused its attention on the Capitol that day, and took the lead participating in and encouraging violence, property destruction, and breaches. And Johnson was not content to let others do his bidding that day: as detailed above, he personally assaulted officers.

When officers were at their most vulnerable, backed into a Tunnel, Johnson joined the rioters swaying and pressing their body weight in an effort to break through the police line. See *Exhibit 11*. When participating in the second push, Johnson recognized that merely pushing was not sufficient, he escalated the danger by handing forward dangerous weapons—a sledgehammer and pepper spray—for rioters to use against police, resulting in at least one officer being sprayed. And not just any cannister of pepper spray: a cannister the size of a fire extinguisher.

Johnson's sentencing memo asks for a downward departure because "pepper spray is not likely to cause death or great bodily injury in the manner in which it commonly used."  ECF No. 170 at 5-6.  He does not even attempt to make such an argument to minimize Johnson's attempt to facilitate the use of a sledgehammer on fellow human beings. Johnson's argument that pepper spray is not that bad is wrong.  For one, he did not use pepper spray "in the manner in which it is commonly used." *Id.* He did not use it, as the defense expert has seen it, in a controlled training environment.  Rather, he contributed to its use against a badly outnumbered group of officers in a confined space where the spray and residue could hang in the air, leading to near-constant

exposure and making it impossible to decontaminate from the spray's effects.

Moreover, taking away those officers' ability to see, even temporarily, and causing debilitating pain, even temporarily, as pepper spray does, threatened those officers' lives and the lives of officers around them.    Unable to see, they could not defend themselves against the myriad objects being thrown at them – table legs, speaker boxes – the baton attacks, or, perhaps most dangerously, from being pulled into the crowd.    *See, e.g.*, Gov. Sent. Mem., *United States v. Stager*, No. 21-cr-35 (RC), Dkt. 333, at 6-9 (describing how two MPD officers were pulled into the crowd; one was beaten with a flagpole and a police baton; another had his helmet knocked off and was struck with poles and stomped on); Gov. Sent. Mem., *United States v. Rodriguez*, No. 21-cr-246 (ABJ), Dkt. 189 at 21-27 (describing how MPD officer was dragged into the crowd, where a rioter repeatedly used an electroshock device on his neck).

Recognizing the danger of OC spray attacks perpetrated by rioters in the Tunnel – the spot of Johnson's attack – Judge Mehta imposed an additional enhancement to a defendant's sentence based on a finding that the use of OC spray created a *substantial* risk of serious bodily injury. *United States v. Schwartz,* No. 21-cr-178 (APM), Dkt. 213 (May 5, 2023 Sent. Tr.) at 13.    Judge Mehta observed, "[g]iven the circumstances of that day, for any officer to have been blinded even momentarily created an additional substantial risk of injury, given that there were multiple—not multiple—there were hundreds and thousands of other people intending to and doing harm to police officers that day." *Id.* at 13-14.

Moreover, as the government has shown repeatedly in trials of several defendants who attacked officers with OC spray, OC spray attacks individuals differently.    While death may be statistically uncommon, OC spray is likely to cause pain.    Many officers have, in fact, reported

that it caused extreme physical pain.   Testifying in *United States v. Schwartz,* 21-cr-178 (APM), MPD Officer Christopher Boyle described being sprayed with OC spray during training and on January 6 as a "9 or 10 out of 10" on the pain scale.   *Schwartz,* 21-cr-178 (APM), 11/30/22 Trial Tr. (Ex. 13) at 460.   In the same trial, MPD Officer Pitt testified to feeling "severe burning." *Schwartz,* 21-cr-178 (APM) 12/1/2022 Trial Tr. (Ex. 14) at 567. In the *Worrell* trial, former U.S. Capitol Police officer Stephen Lowe described an individual – whom he believed to have a high pain tolerance – "screaming out in pain" during a training exercise involving OC spray and describing the pain as "excruciating."   *United States v. Worrell,* 4/27/23 Trial Tr. (Ex. 17) at 78. USCP's training officer has compared OC spray to pouring "hot melted metal in your eyes, right into your eye sockets." *Id.* at 125 (Ex. 18). One officer was so desperate to decontaminate he flushed his eyes with urinal water; another was unable to eat for a day because he felt like he was "chewing and swallowing glass" and feeling like his "entire body was on fire." *United States v. Worrell,* 4/26 Trial Tr. (Ex.15) at 42, 44.

According to the toxicologist who testified in *United States v. Worrell,* 21-cr-292 (RCL) (testimony attached as Exhibit 19), when OC comes into contact with the eyes, neurotransmitters trigger a "very strong reflex" causing the eyes to shut "very tightly … in some respects, violently," to protect the body from additional exposure. *Id.* at 110. The eyes and the skin on a person's face are particularly sensitive due to the large number of pain receptors present. *Id.* at 111. Once OC enters the nasal passageway, a person's respiratory tract also clinches shut to prevent the chemical from entering the lungs, causing a person to have difficulty breathing, sometimes leading to bronchospasm, extreme tightening of the respiratory tract. *Id.* at 112. A person experiencing bronchospasm will wheeze heavily and may lose the ability to breathe altogether. *Id.*

35

Moreover, approximately 15 percent of people exposed to OC will experience severe medical problems requiring emergency medical treatment. *Id.* at 117-18. In rare cases, persons exposed to pepper spray have died of heart attack or heart failure, or severe heart or respiratory failure. *Id.* at 124, 133. Individuals with asthma are particularly vulnerable; a capsaicin exposure is more likely to cause an individual with asthma to not be able to breathe, which could trigger other serious medical complications. *Id.* at 123.

In addition to the impairment of the lungs, OC also triggers dial aged blood vessels which, in turn, may cause bradycardia or tachycardia (unsafe high or low heart rate) the risks of which increase if a person is already engaged in strenuous physical activity. *Id.* at 113-14, 118. Rapid changes in blood pressure can cause a person to lose consciousness. *Id.* at 123. OC exposure to the eyes may cause corneal abrasions due to extreme dryness, which may take days or weeks to heal. *Id.* at 116. The risk of corneal abrasion and permanent eye damage increases if a person is not able to decontaminate right after being exposed, as occurred when officers were sprayed on January 6. *Id.* at 117. The cornea is also vulnerable to infection; a secondary infection due to capsaicin-induced corneal damage may cause long-term eye problems. *Id.* at 121.   Contrary to Johnson's claim, OC spray is no "garden hose" (ECF No. 170 at 4).

The Court should thus reject any argument that the nature of Johnson's assault warrants a variance from the Guidelines range.   The Guidelines range does not account for his attempt to help rioters to attack officers with a sledgehammer.   And the dangers and intense pain caused by an OC spray attack, particularly in the Tunnel on January 6, fully justify the four-point enhancement under the Guidelines.   In fact, because Johnson was not required to plead to 18 U.S.C. § 111(b), despite using what he admits was a dangerous weapon, his Guidelines range is in

36

fact lower than it otherwise might be, as an assault under 18 U.S.C. § 111(b) brings an extra two-point enhancement that Johnson avoids.

Taken together, Johnson's role enabling rioters to attack the police with dangerous weapons, his coordination with the Proud Boys and celebration of violence on that day, and the fact that he played a role in the most brutal battle to take place during the January 6 attack, supports a sentence at the top of Johnson's Guidelines range.

**B.  The History and Characteristics of the Defendant**

Johnson is a contractor/carpenter who resides in St. Petersburg, Florida. PSR ¶ 80. He has a significant history of arrests and convictions which weighs in favor of a lengthy period of incarceration:

- In 2007, the defendant was charged with and pleaded nolo contendere to Possession of Clonazepam. He was sentenced to 18 months' probation. During probation Johnson recorded a violation. PSR ¶ 50.

- In 2007, the defendant was charged with and pleaded nolo contendere to Possession of Marijuana. He was sentenced to 12 months' probation. PSR ¶ 51.

- In 2011 the defendant was charged with and pleaded guilty to Obtaining or Attempting to Obtain a Controlled Substance. He was sentenced to 24 months' probation. During probation Johnson recorded five violations for drug use, failing to report, and absconding. PSR ¶ 53.

- The defendant also has two traffic violations. PSR ¶ 52 and 54.

Johnson's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a long series of offenses. Johnson's criminal history demonstrates a propensity towards criminality culminating in the absolute violence was January 6, 2021.

Prior to January 6, Johnson chose to affiliate himself with a group that placed a premium on violence. In fact, Johnson continued to celebrate the violence of January 6 for months after the

national disgrace. Moreover, even after his fellow Proud Boys began to get arrested for their criminal conduct on January 6, Johnson continued to celebrate *his* role in the offense. On March 16, 2021, Johnson shared his "avatar" in a text and commented, "Me in DC. With blood and bear spray."



Johnson's history and characteristics, including his history of arrest and conviction, including the present conviction for an assault, weigh heavily in favor of a lengthy term of incarceration. The government's recommendation, however, gives defendant some credit for his participation in a proffer.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Johnson's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   First, Johnson has a criminal history category of II. His history of arrest and conviction shows a clear pattern of criminal behavior. *See* Section VI(B) *supra.* Even when on supervision, Johnson has a history of violations, including while on this Court's supervision. Johnson violated six times between his 2007 and 2011

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

convictions. While on this Court's pre-trial supervision, Johnson was arrested on January 24, 2023, the defendant was charged with Repeated Harassing Phone Calls. The PSR notes the calls included threats of violence. The victim in that case were his wife and the mother of his child. Though the charges were not prosecuted after the complainant showed a lack of interest, the victim did seek and obtain a permanent Protection Order in November of 2022. PSR ¶ 57. Furthermore, while on pre-trial supervision, Johnson tested positive for marijuana in February of 2022 and in April of 2023. All show a lack of respect for the law and the courts.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.    Unlike defendant Johnson, none of the

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

defendants below coordinated their conduct with the Proud Boys – a significant aggravating factor that sets Johnson apart.

*United States v. Mitchell Gardner*, 21-cr-622-APM. Gardner was the second person to spray the can that Johnson passed forward. See *Exhibit 10* at 4:00-4:15. See also ECF No. 57 at 18-21. Afterward, Gardner encouraged others to assault officers and used officers' own equipment to bust in a window of the Capitol and then entered the building, from where he encouraged others to also enter the Capitol and handed out items that were used as weapons against police. Gardner was sentenced to 55 months of incarceration after pleading guilty to violations of §§ 1512, 231, and 111(a) and (b). The requested sentence here reflects Johnson's assaultive pushes and contributions to the spray being used by fellow rioters such as Gardner.

*United States v. Devlyn Thompson*, 21-cr-461-RCL. Thompson and other rioters fought law enforcement officers in the Tunnel for approximately 13 minutes. Specifically, Thompson encouraged other rioters, threw objects at officers, and hit one officer on the hand with a metal baton, causing a bruise. Thompson self-surrendered and agreed to plead guilty to one count prior to his arrest or formal charging: a violation of 18 U.S.C. § 111(a)(1) and (b). The Court imposed a 50-month sentence. Like Johnson, Thompson participated in an assaultive push against police. While Thompson used a dangerous weapon, Johnson handed dangerous weapons to his fellow rioters, knowing they would be used the same way Thompson used his weapon. Unlike Johnson, Thompson demonstrated extraordinary acceptance of responsibility, turning himself into law enforcement and cooperating with the Government by providing information at multiple proffer sessions, prior to his guilty plea.

*United States v. Palmer*, 21-cr-328-TSC.   Palmer, like Gardner, deployed the contents of

an OC canister directly into the Lower West Terrace tunnel onto law enforcement officers. For assaulting law enforcement officers with a dangerous or deadly weapon, Palmer was sentenced to 63 months' imprisonment for violating §111(a) and (b).

*United States v. Cody Mattice and James Mault,* 21-cr-657 (BAH). Mattice and Mault traveled to Washington, D.C. anticipating violence. They engaged officers on the front lines at the West Plaza and in the Lower West Terrace Tunnel, and assaulted officers with chemical irritants. Before that, Mattice recorded, on a mobile phone video Mault encouraging officers who were guarding the outside of the Capitol building to stand aside and let the rioters gain access to the building. Both Mattice and Mault pleaded guilty to § 111(a)(1) and the court imposed identical sentences of 44 months' incarceration.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Johnson must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6.[11] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Johnson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 111.

## VIII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 50 months of incarceration, 3 years of supervised release, $2,000 in restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

---

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

BY:    */s/ REBEKAH LEDERER*
REBEKAH LEDERER
Pennsylvania Bar No. 320922
Assistant United States Attorney
U.S Attorney's Office for District of Columbia
601 D St. N.W, Washington, DC 20530
(202) 252-7012
rebekah.lederer@usdoj.gov